UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. 15-CV-80505-RYSKAMP

| | |
|---|---|
| HARRY ROTHENBERG, Individually and on Behalf of All Others Similarly Situated and Derivatively on Behalf of Nominal Defendant Imperial Holdings Inc., | COMPLAINT – CLASS ACTION |
| | DEMAND FOR JURY TRIAL |

            Plaintiff,

    vs.

PHILLIP F. GOLDSTEIN, ANDREW
DAKOS, ANTONY MITCHELL, JAMES M.
CHADWICK, RICHARD DAYAN,
MICHAEL A. CROW, and GERALD
HELLERMAN,

            Defendants,

    vs.

IMPERIAL HOLDINGS, INC.,

            Nominal Defendant.

_____/

**VERIFIED AMENDED SHAREHOLDER CLASS ACTION AND
DERIVATIVE COMPLAINT**

Case No. 15-CV-80505-RYSKAMP

Plaintiff Harry Rothenberg ("Plaintiff"), individually and on behalf of all others similarly situated and derivatively on behalf of Nominal Defendant Imperial Holdings, Inc. ("Imperial Holdings" or the "Company"), hereby files his Verified Amended Shareholder Class Action and Derivative Complaint against Imperial Holdings' Board of Directors (the "Board" or the "Defendants").  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery, and based upon information and belief, alleges as follows:

## SUMMARY OF THE ACTION

1.      This is a direct shareholder class action brought by Plaintiff for breach of fiduciary duties owed to Imperial Holdings' public shareholders, for declaratory and injunctive relief, and for violations of the Securities Exchange Act of 1934 (the "1934 Act"), and a shareholder derivative action brought by Plaintiff on behalf and for the benefit of Imperial Holdings for reckless waste of corporate assets, breach of fiduciary duty, abuse of control, and gross mismanagement.

2.      Nominal Defendant Imperial Holdings is currently under investigation by the United States Securities and Exchange Commission (the "SEC") relating to possible violations of the federal securities laws in connection with its legacy premium finance business and corresponding financial reporting.

3.      Imperial Holdings is also currently under investigation by the Internal Revenue Service Criminal Investigation Division (the "IRS") relating to its structured settlement business, which it sold in October 2013.  The IRS may be investigating the Company for engaging in a nefarious practice of filing knowingly falsified and misleading structured settlement petitions and

- 1 -

Case No. 15-CV-80505-RYSKAMP

related documents in several state courts across the country, resulting in the Company failing to pay millions of dollars in federal excise taxes.

4.      In September 2011, in connection with an investigation of the Company by the United States Attorney's Office for the District of New Hampshire, the Company's headquarters were raided by the Federal Bureau of Investigation (the "FBI") and other federal agents.  The raid and investigation resulted in a settlement pursuant to which the Company: (a) paid an $8 million penalty to the United States Government; (b) incurred legal costs of more than $10.6 million; (c) agreed to discontinue its insurance premium loan financing activities, which historically accounted for the majority of the Company's income; and (d) agreed that the Company lacked appropriate internal controls to prevent potential fraudulent practices in its premium finance business.  The SEC and the IRS were not parties to this settlement.

5.      Thereafter, Imperial Holdings' directors and officers were named as defendants in securities class and derivative actions.  These actions were ultimately resolved by the payment of $12 million in cash and approximately $1.6 million in warrants to owners of Imperial Holdings shares and the adoption by Imperial Holdings of sweeping corporate governance, compliance, and internal control reform measures.  The release of claims in the settlement agreement in the securities fraud action relates solely to claims "arising from or related to the purchase or acquisition of securities of Imperial [Holdings] either (i) pursuant and/or traceable to the Registration Statement issued in connection with [the Company's] February 7, 2011 initial public offering or (ii) on the open market on or prior to February 21, 2012."[1]  The release of claims in the settlement in the

---

[1]     *See* Stipulation and Agreement of Settlement, *Fuller v. Imperial Holdings, Inc.*, Case No. 11-81184-CIV-MARRA (S.D. Fla. Aug. 2, 2013), ECF No. 88-1 at 16-17.

Case No. 15-CV-80505-RYSKAMP

derivative case relates solely to Imperial Holdings' "life settlement business" and the Company's internal controls and statements concerning the same, and has nothing to do with claims relating to the Company's structured settlement business.[2]

6. Notwithstanding this background and the ongoing investigations by the SEC and the IRS, and indeed, seemingly because of these investigations of potential illegal activity by the Company and its executives, on November 3, 2014, Imperial Holdings' directors (the "Defendants") adopted a bylaw (the "Minimum-Stake-To-Sue Bylaw" or the "Bylaw"), the sole purpose of which is to insulate Defendants from shareholder redress for violations of state and federal statutory law and breaches of fiduciary duties, both in the past and in the future. On information and belief, only companies connected to defendant and Imperial Holdings Chairman Phillip F. Goldstein ("Goldstein") have attempted similar measures.

7. The Minimum-Stake-To-Sue Bylaw places all-but-insurmountable hurdles before the courthouse doors and is designed to, and effectively does, preempt and eliminate public shareholders' statutory and common law rights to commence and prosecute shareholder class and derivative litigation against Defendants, no matter how egregious the wrongs.

8. Indeed, two leading corporate governance and proxy advisory firms, Institutional Shareholder Services, Inc. ("ISS")[3] and Glass Lewis & Co. ("Glass Lewis") have come out squarely

---

[2]    *See* Proof of Claim and Release, at p. 5, *Fuller v. Imperial Holdings, Inc.*, Case No. 11-81184-CIV-MARRA (S.D. Fla.), *available at* www.imperialholdingssettlement.com/docs/poc.pdf.

[3]    ISS "is the world's leading provider of corporate governance solutions for asset owners, hedge funds, and asset service providers. ISS' solutions include objective governance research and recommendations, end-to-end proxy voting and distribution solutions, turnkey securities class-action claims management, and reliable global governance data and modeling tools. Institutional clients turn to ISS to apply their corporate governance views, identify governance risk, and manage their complete proxy voting needs on a global basis." http://www.issgovernance.com/about/about-iss/.

Case No. 15-CV-80505-RYSKAMP

against the Minimum-Stake-To-Sue Bylaw at issue here, issuing a strong recommendation AGAINST shareholder approval, stating that the Bylaw does not distinguish between frivolous and meritorious lawsuits; its necessity has not been demonstrated by a trend of frivolous lawsuits at the Company, since there have not been any such lawsuits; and the Bylaw could serve to entrench and protect directors from all forms of shareholder monitoring and action, particularly since Imperial's Board may be elected by a mere plurality of votes cast, rather than a majority.

9.      The Minimum-Stake-To-Sue Bylaw unilaterally overrides and is irreconcilable with federal and state law and judicial precedent, which expressly mandates the requirements that public shareholders must meet to commence and prosecute class or derivative actions.  The Minimum-Stake-To-Sue Bylaw requires current and former shareholders who wish to file a class or derivative action against or on behalf of Imperial Holdings, its directors, or its officers to first obtain *written consent from other shareholders beneficially owning at least 3%, or over 642,000 Company shares.*  That number is anticipated to rise to more than 800,000 shares upon completion of a rights offering announced on May 14, 2015 and scheduled to terminate on June 18, 2015.

10.      The Minimum-Stake-To-Sue Bylaw was adopted in breach of Defendants' fiduciary duties because, upon information and belief, the Defendants' sole intent was to reduce their risk of being held accountable to the Company or its shareholders for any violations of law, including criminal law, breaches of fiduciary duties or other misconduct, and to protect their tenure by entrenching their control of the Company.

11.      The Minimum-Stake-To-Sue Bylaw imposes a pre-filing requirement so onerous that it effectively guarantees that, notwithstanding the provisions of federal and state law, no class or derivative actions can be filed against Defendants or the Company, regardless of the extent of their

- 4 -

misconduct.  With the powerful deterrent of the derivative and securities class action mechanisms gone, shareholder and judicial oversight will all but be eliminated.  Defendants will have a freer hand to engage in wrongful and unlawful conduct in breach of their fiduciary duties without exposing themselves to substantial liability, knowing they have insulated themselves from the laws enacted by Congress and the State Legislature to protect the Company and investors from such misconduct.

12.     To be sure, in the Company's Proxy Statement filed on Schedule 14A with the SEC on April 8, 2015 (the "Proxy"), and in connection with Defendants' attempts to obtain a shareholder "advisory vote" on the Minimum-Stake-To-Sue Bylaw, Defendants admit: "There is a possibility that the requirement to obtain 3% of the applicable outstanding shares may prevent a meritorious lawsuit by a small shareholder on behalf of the Company or a class of shareholders from being prosecuted."  Proxy at 34.

13.     The Minimum-Stake-To-Sue Bylaw also falls outside the scope of authority granted by Fla. Stat. §607.0206 because it does not relate to the business or affairs of the corporation and is irreconcilable with federal and Florida law.  Although Imperial Holdings, through Defendants, has stated in the Proxy that Company shareholders will have an "advisory vote" on this Minimum-Stake-To-Sue Bylaw, and that Defendants "intend[] to repeal the [Bylaw] if the shareholders do not approve this proposal," the Minimum-Stake-To-Sue Bylaw is nevertheless effective as of November 3, 2014.  Proxy at 33.

14.     By adopting the Minimum-Stake-To-Sue Bylaw that is unrelated to the business or affairs of the Company and is irreconcilable with federal and Florida law, Defendants have acted disloyally and in bad faith and placed their own interests in avoiding liability to shareholders over

- 5 -

Case No. 15-CV-80505-RYSKAMP

the interests of both the Company and the public shareholders to whom they owe fiduciary duties. Moreover, on information and belief, Defendants adopted the Minimum-Stake-To-Sue Bylaw without being fully informed, by independent legal advisors, of the circumstances surrounding the validity and legality of the Minimum-Stake-To-Sue Bylaw, in breach of their fiduciary duties of due care.

15.     Plaintiff seeks a declaratory judgment in his favor, declaring that the Minimum-Stake-To-Sue Bylaw is an *ultra vires* act adopted in breach of Defendants' fiduciary duties, is irreconcilable with federal and Florida law and public policy, and is invalid and unenforceable. Plaintiff also seeks a preliminary and permanent injunction barring Defendants from enforcing the Minimum-Stake-To-Sue Bylaw.  For this purpose, Plaintiff has no adequate remedy at law.

16.     Moreover, Defendants caused Imperial Holdings to file a false and misleading Proxy with the SEC in connection with their solicitation of votes in favor of the Minimum-Stake-To-Sue Bylaw.  The Proxy failed to disclose material information to the Company's shareholders in connection with their "advisory vote" on the Minimum-Stake-To-Sue Bylaw, which over 33% of the Imperial Holdings shareholders who voted on the Minimum-Stake-to-Sue Bylaw voted against on May 28, 2015.  As detailed below, Defendants' Proxy violated §14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder by:

(a)     creating a materially misleading impression that shareholder litigation serves no legitimate purpose;

(b)     failing to explain the meaning of the following sentence: "nor does it apply to claims….where a private right of action at a lower threshold….is expressly authorized by statute;"

- 6 -

Case No. 15-CV-80505-RYSKAMP

(c)     creating a materially misleading comparison between the Minimum-Stake-To-Sue Bylaw and inapt statutes and laws;

(d)     failing to disclose material information concerning, and the underlying purposes of, the IRS and SEC investigations;

(e)     failing to disclose the basis for the Board's stated belief that the Minimum-Stake-To-Sue Bylaw will not unduly deter the prosecution of meritorious litigation;

(f)     failing to disclose the basis for the Board's stated belief that current law (including Rule 11 of the Federal Rules of Civil Procedure, §57.105, Florida Statutes, the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4 ("PSLRA"), the Securities Litigation Uniform Standards Act, 15 U.S.C. §78bb, and the business judgment rule) is not adequate to deter unmeritorious litigation;

(g)     failing to disclose the Board's understanding – in view of its own self-interest – of what constitutes meritorious or unmeritorious litigation;

(h)     failing to disclose that of the purported nine shareholders who individually own at least 3% of the Company's outstanding shares, at least four are insiders connected to Bulldog Investors, LLC ("Bulldog") or executives of the Company;

(i)     failing to disclose what basis the Board has for choosing a 3% threshold of ownership, as opposed to any other percentage, particularly in view of considerations 4 and 1 on page 34 of the Proxy;

(j)     failing to disclose the basis for the representation in consideration 6 on page 34 of the Proxy that the Minimum-Stake-To-Sue Bylaw will reduce the cost of D&O insurance;

(k)     failing to disclose the existence of the *Lafontant* litigation in the United States District Court for the Southern District of New York, which could be grounds for future representative litigation against the Company and its directors and/or officers;

(l)     failing to disclose the fact that individual shareholder pursuit of "meritorious" litigation is disincentivized by the cost and complexity of such litigation, which is tempered only as long as shareholders have the ability to pursue class and derivative litigation;

(m)     failing to explain the contradiction of whether the vote on the Bylaw is "advisory;"[4] and

(n)     failing to disclose that the nation's most respected corporate governance and proxy advisory firms, ISS and Glass Lewis strongly recommended AGAINST the Minimum-Stake-To-Sue Bylaw.[5]

17.     Finally, Plaintiff sues five of the seven Defendants[6] derivatively on behalf of the Company based on their sustained, systemic, and reckless failure to monitor and oversee the Company's structured settlement business and, upon information and belief, its practice of filing knowingly falsified and misleading structured settlement petitions in state courts across the country,

---

[4]     Plaintiff put Defendants on notice of these false and misleading statements in the Proxy by an email to Defendants' counsel on April 9, 2015, which attached a Statement in Opposition to the Minimum-Stake-To-Sue Bylaw, which Plaintiff requested be included in the Proxy.  On April 10, 2015, Defendants caused the Company to file a Schedule 14A (Definitive Additional Materials) with the SEC attaching Plaintiffs' Statement in Opposition.

[5]     Upon learning of ISS and Glass Lewis' recommendations AGAINST the Minimum-Stake-To-Sue Bylaw, Plaintiff's counsel requested that Defendants file anther supplement to its Proxy to advise shareholders of this fact.  Defendants refused.

[6]     Specifically defendants Goldstein, Dakos, Mitchell, Crow, and Hellerman (the "Derivative Defendants").

Case No. 15-CV-80505-RYSKAMP

which likely forms at least part of the basis of the ongoing IRS investigation and was not the subject of prior class or derivative litigation.

18.     Upon information and belief, the Derivative Defendants knew or recklessly disregarded, while they were directors of the Company, that Company employees were engaged in a scheme to obtain non-qualified court orders for structured settlement factoring transactions.  This scheme has had the effect of leaving the Company potentially liable for unpaid federal excise taxes pursuant to Internal Revenue Code §5891(a), which are unaccounted for in Imperial Holdings' financial statements and likely amount to tens of millions of dollars, as well as substantial penalties, fines, legal fees, and other damages from the IRS investigation, SEC investigation, and likely Department of Justice and private securities fraud actions.

19.     The reckless conduct of the Derivative Defendants constitutes a clear abuse of control, gross mismanagement, breach of fiduciary duties, and a waste of corporate assets for which they should be held liable to Plaintiff derivatively on behalf of the Company.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over all claims asserted herein pursuant to §27 of the 1934 Act for violations of §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

21.     Venue is proper in this District because Imperial Holdings has its principal place of business in this District.  Plaintiff's claims arose in this District, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists, and where virtually all the witnesses are located and available to testify at the jury trial

Case No. 15-CV-80505-RYSKAMP

permitted on these claims in this Court.  Moreover, each of Defendants, as Company officers and directors, has extensive contacts with this District.

## PARTIES

22.     Plaintiff is, and at all relevant times was, a shareholder of Imperial Holdings.  Plaintiff is a citizen and resident of the state of New Jersey.

23.     Nominal Defendant Imperial Holdings, Inc. is a Florida corporation with its principal place of business located at 5355 Town Center Road, Suite 701, Boca Raton, Florida 33486, and is a citizen of Florida.  Imperial Holdings owns and manages a portfolio of approximately 600 life insurance policies, also referred to as life settlements.  As of December 31, 2014, these life settlements had a fair value of approximately $388.9 million and an aggregate death benefit of approximately $2.9 billion.  The Company primarily earns income on these policies from changes in their fair value and through death benefits when a person covered by one of the policies dies.  The Company has historically operated in two reportable business segments: life finance and structured settlements.  On October 25, 2013, the Company sold its structured settlements business.  Imperial Holdings common stock is listed and publicly traded on the New York Stock Exchange under the symbol "IFT."  As of December 31, 2014, the Company had 21,402,990 shares of common stock outstanding.  There are an additional 1,464,941 shares underlying the Company's convertible notes.

24.     Defendant Goldstein is, and at all material times was, Chairman of the Board of the Company.  Goldstein is also co-founder of Bulldog Investors, an activist investor group that beneficially owns approximately 11.9% of Imperial Holdings common stock.  Goldstein is also the Chairman of the Board of Special Opportunities Fund, Inc. and sits on the boards of The Mexico

Equity and Income Fund, Inc., and MVC Capital, Inc. along with defendants Dakos and Hellerman. Goldstein became a director of the Company in August 2012.

25.     Defendant Andrew Dakos ("Dakos") is, and at all material times was, a Director of Imperial Holdings.  Dakos is also affiliated with Bulldog Investors.  Dakos is also the President of Special Opportunities Fund, Inc., and sits on its board and the board of The Mexico Equity and Income Fund, Inc., along with defendants Goldstein and Hellerman.  Dakos became a director of the Company in August 2012.

26.     Defendant Antony Mitchell ("Mitchell") is, and at all material times was, Chief Executive Officer and a Director of Imperial Holdings.  Mitchell beneficially owns approximately 8.7% of the Company's common stock.  Mitchell has served as the Company's Chief Executive Officer since February of 2007 and prior to August 14, 2012, also served as Chairman of the Board. From 2001 to January 2007, Mitchell was Chief Operating Officer and Executive Director of Peach Holdings, Inc., a holding company which, through its subsidiaries, was a provider of specialty factoring services.  Since October 2013, Mitchell has served as interim chief executive officer of DRB Capital, the purchaser of the Company's structured settlement business.

27.     Defendant James M. Chadwick ("Chadwick") is, and at all material times was, a Director of Imperial Holdings.  Chadwick beneficially owns approximately 5,181 shares of the Company's common stock.  Chadwick became a director of the Company in June 2013.

28.     Defendant Richard Dayan ("Dayan") is, and at all material times was, a Director of Imperial Holdings.  Dayan beneficially owns 30,381 shares of the Company's common stock. Dayan became a director of the Company in June 2013.

29.    Defendant Michael A. Crow ("Crow") is, and at all material times was, a Director of Imperial Holdings.  Crow beneficially owns 6,002 shares of the Company's common stock.  Crow became a director of the Company in February 2011.

30.    Defendant Gerald Hellerman ("Hellerman") is, and at all material times was, a Director of Imperial Holdings.  Hellerman beneficially owns 32,809 shares of the Company's common stock.  He is also affiliated with Bulldog Investors.  Hellerman also sits on the boards of The Mexico Equity and Income Fund, Inc., Special Opportunities Fund, Inc., and MVC Capital, Inc. together with defendants Goldstein and Dakos.  Hellerman became a director of the Company in August 2012.

31.    The Defendants are the seven members of the Board who adopted the invalid Bylaw in order to reduce their risk of being held liable to Imperial Holdings or its shareholders for violations of law and breaches of fiduciary duties, and caused Imperial Holdings to file the false and misleading Proxy with the SEC.  In addition, the Derivative Defendants consisting of defendants Goldstein, Dakos, Mitchell, Crow, and Hellerman, failed to exercise their proper oversight authority over the Company's structured settlement business that permitted Company employees to engage in a nefarious scheme to file knowingly falsified and misleading structured settlement petitions in state courts across the country, which, upon information and belief, forms at least part of the purpose behind the ongoing IRS investigation, and may result in the Company paying tens of millions of dollars in excise taxes to the IRS, on top of the fines and other penalties forthcoming.

Case No. 15-CV-80505-RYSKAMP

## FACTUAL ALLEGATIONS

### Defendants Adopted an Illegal Bylaw that Shields Them from Liability

32.     On November 3, 2014, Imperial Holdings announced that Defendants, without shareholder approval, adopted the unprecedented Minimum-Stake-To-Sue Bylaw.  The Minimum-Stake-To-Sue Bylaw, which went into effect immediately, states:

> Section 3.16 Representative Claims. Except where a private right of action at a lower threshold than that required by this bylaw is expressly authorized by applicable statute, a current or prior shareholder or group of shareholders (collectively, a "Claiming Shareholder") may not initiate a claim in a court of law on behalf of (1) the corporation and/or (2) any class of current and/or prior shareholders against the corporation and/or against any director and/or officer of the corporation in his or her official capacity, unless the Claiming Shareholder, no later than the date the claim is asserted, delivers to the Secretary written consents by beneficial shareholders owning at least 3% of the outstanding shares of the corporation as of (i) the date the claim was discovered (or should have been discovered) by the Claiming Shareholder or (ii), if on behalf of a class consisting only of prior shareholders, the last date on which a shareholder must have held shares to be included in the class.

33.     Contrary to federal and Florida law, judicial precedent and public policy, the Minimum-Stake-To-Sue Bylaw prohibits both current and former shareholders from initiating a derivative action on behalf of the Company or a shareholder class action against the Company, its officers, or its directors without first obtaining written consent from other shareholders owning at least 3% of Imperial Holdings common stock, which amounts to more than 642,000 shares (which would increase upon conversion of the Company's convertible notes).

34.     Indeed, because Company insiders and entities associated with them, including Defendants, control over 21% of the Company's shares, public shareholders would need to obtain written consents from *well over 3% (or over 642,000)* of the non-insider shares in order to seek

- 13 -

Case No. 15-CV-80505-RYSKAMP

redress against the insiders.[7] By contrast, Imperial Holdings' Bylaws provide that a stockholder who wishes to nominate a director must hold only 1% of the Company's outstanding stock.

    35.    This draconian provision appears to be one of the first of its kind in the nation, but its purpose is clear: to reduce the risk of Defendants being held liable to the Company or its shareholders for any violations of federal and state law or other misconduct, both in the past and in the future, no matter how egregious.

---

[7]  On May 14, 2015, Imperial Holdings issued a press release announcing the Company's intent to conduct a rights offering to issue up to 5,350,747 shares of common stock, for a total of approximately $30,700,000.  The rights offering will apply to shareholders of record at the close of business on May 26, 2015.  Pursuant to the rights offering, Imperial Holdings will distribute one non-transferrable subscription right for every four shares of common stock owned by shareholders of record.  Each right will entitle the holder to subscribe for one share of common stock at $5.75 per share.  The subscription period will commence on May 27, 2015 and terminate at 5:00 pm on June 18, 2015, "unless extended."  The press release also states that rights holders who fully exercise their rights "will be entitled to subscribe for additional shares of common stock not purchased by other Rights holders through their basic subscription privilege, subject to proration."  If the rights offering is oversubscribed, the Company may, at the Board's discretion, issue up to an additional 1,337,686 shares.  The press release indicates that Defendant Mitchell and other members of the Board are expected to participate in the rights offering, and that Bulldog Investors LLC intends to subscribe for at least $10,000,000 worth of shares.

    The rights offering undoubtedly favors Imperial Holdings' largest shareholders.  Put simply, the more shares you own, the more you can buy in the rights offering.  The impact of such favoritism will be to further consolidate share ownership in the hands of Imperial Holdings' largest investors, thus making compliance with the Minimum-Stake-To-Sue Bylaw all the more impossible.  On top of that, because the number of outstanding shares is increasing significantly, shareholders will now be required to obtain the consent of ***between 802,522 and 842,652 shares*** (depending on whether the offering is oversubscribed) in order to exercise their statutory and common law rights against the Company.  Notably, neither the rights offering nor its impact on the Minimum-Stake-To-Sue Bylaw were mentioned by the Company in the Proxy.  This is significant because upon information or belief, Defendants knew at the time of the issuance of the Proxy that they were planning this rights offering which, depending on the number of shares issued, will materially increase between 25% and 31.25% the amount of shares needed to reach the 3% threshold over the 642,000 shares currently required.

Case No. 15-CV-80505-RYSKAMP

36.     Thus, the Minimum-Stake-To-Sue Bylaw creates an onerous, unreasonable, and unlawful obstacle designed solely to prevent shareholders from exercising their statutory right to bring valid derivative claims or class action litigation.   Similarly, it denies the Court the responsibility and power of determining whether the claims sought to be litigated are meritorious or frivolous.

37.     The insurmountable nature of the Minimum-Stake-To-Sue Bylaw's written consent requirement is magnified by the fact that there is no publicly available list of Imperial Holdings' shareholders.   Without such a list, there is no feasible way for Company shareholders to obtain contact information for other Imperial Holdings shareholders to obtain their consent.   On top of that, only a fraction of a company's shareholders – generally institutional investors and company insiders – publicly disclose their share holdings.

38.     Indeed, ISS came out squarely against the Minimum-Stake-To-Sue Bylaw at issue here, issuing a strong recommendation AGAINST shareholder approval, stating in a May 14, 2015 Proxy Analysis and Vote Recommendation:

> A vote AGAINST this item is warranted. The parameters of the new bylaw may not necessarily distinguish between frivolous and meritorious lawsuits, and its necessity has not been demonstrated by a trend of frivolous lawsuits at the company. Additionally, the bylaw could serve to entrench and protect directors from all forms of shareholder action.
>
> * * * *
>
> Provisions which require a plaintiff to demonstrate that her case is supported by a significant number of other shareholders may be helpful for a company that has been plagued by frivolous lawsuits and has historically paid to settle shareholder fraud or derivative class actions. The board of Imperial Holdings, however, does not provide specific instances in which the company has been subject to frivolous claims. As such, the risk being addressed appears at best speculative, while the reduction in shareholder rights and protections is both immediate and real. As importantly, the proposed by-law may not necessarily distinguish frivolous from meritorious lawsuits,

- 15 -

given that the process of soliciting shareholder support for a legal action may not be nearly as robust a vetting as the legal process itself. Many investors who may be happy to join a class, and to receive their share of a settlement or judgment, may nonetheless be reluctant to initiate litigation, or to be seen as the party enabling litigation to proceed.

The bylaw could also serve to entrench a board by insulating it from a powerful mechanism for shareholder monitoring. This is particularly a concern when, as here, directors may be elected by a mere plurality of votes cast, rather than a majority. In light of these factors, a vote AGAINST this item is warranted.[8]

39.     For similar reasons, another leading independent governance analysis and proxy advisory firm, Glass Lewis, also recommended strongly AGAINST the Minimum-Stake-To-Sue Bylaw.

### Defendants Adopted the Minimum-Stake-To-Sue Bylaw in Bad Faith and in Breach of Their Fiduciary Duties

40.     It is axiomatic that Defendants, as directors of a public corporation, owe the Company's shareholders fiduciary duties, including the duties of good faith, loyalty, and due care. The power of corporate directors to amend bylaws must be exercised in accordance with their fiduciary duties to the shareholders.

41.     Where directors have self-interest in a bylaw amendment or did not adequately inform themselves before adopting the amendment, the burden of proving the inherent or entire

---

[8]     In the past, ISS also recommended a vote AGAINST an identical bylaw that was adopted by the board of directors of The Mexico Equity & Income Fund, Inc., another company controlled by defendant Goldstein and on whose board Goldstein, Dakos, and Hellerman sit.  There, ISS noted an additional rationale against the adoption of such bylaws:

> The types of lawsuits this by-law could prevent from occurring would not be limited to any specific type of lawsuit. In fact, the parameters of the new by-law do not distinguish between frivolous or meritorious lawsuits. The by-law would effectively prevent small shareholders from suing the fund that cannot obtain the support of at least three percent of the fund's outstanding shares. The fund's float is currently about 6.7 million shares. Under this by-law, an investor would have to submit written consent from holders of about 203,000 shares.

Case No. 15-CV-80505-RYSKAMP

fairness of their adoption of the Minimum-Stake-To-Sue Bylaw is placed upon Defendants as a matter of law.

42.     Here, Defendants have a material self-interest in the Minimum-Stake-To-Sue Bylaw and adopted it in bad faith and in breach of their fiduciary duties.  On information and belief, they acted with the sole purpose of reducing their risk of being held liable to the Company and its shareholders for violations of federal and Florida law and other misconduct.  In sum, Defendants have taken the law into their own hands and given themselves a license to commit securities fraud and ignore their clear fiduciary obligations without any accountability to the Company's shareholders.  Defendants have, thus, unlawfully placed their own interests above the interests of the Company and its shareholders to whom they owe fiduciary duties.

43.     Defendants, on information and belief, also adopted the Minimum-Stake-To-Sue Bylaw without being fully informed of the circumstances and legality surrounding the Minimum-Stake-To-Sue Bylaw by independent legal advisors, in breach of their fiduciary duties of due care.

**The Minimum-Stake-To-Sue Bylaw Is Invalid**
**Under Florida Statutes §607.0206 and the Federal Securities Laws**

44.     Fla. Stat. §607.0206(2) provides that "[t]he bylaws of a corporation may contain any provision *for managing the business and regulating the affairs of the corporation that is not inconsistent with law* or the articles of incorporation." (Emphasis added.)

45.     The Minimum-Stake-To-Sue Bylaw is invalid under Section 607.0206(2) because it does not pertain to the "managing [of] business" or "the affairs of the corporation."  Rather, it is an *ultra vires* attempt to override and preempt statutory law and impermissibly regulate the legal process by which current and former shareholders may obtain redress for harms caused by Defendants and other members of Company management.

- 17 -

Case No. 15-CV-80505-RYSKAMP

46.     To be sure, in the history of the corporate form bylaws have never been meant to concern the judicial process and access to courts, as the Minimum-Stake-To-Sue Bylaw here does by effectively eliminating the right of small shareholders to bring derivative and securities class action lawsuits.

47.     Indeed, Florida law is clear that any attempts to "defin[e], limit[], and regulat[e] the powers of the corporation and its board of directors **and shareholders**" may only be included, provided they are "not inconsistent with law," in a company's articles of incorporation, not in bylaws, which are limited under Florida law to "[m]anaging the business and regulating the affairs of the corporation."  *See* Fla. Stat. §607.0202 (emphasis added).

48.     Defendants' disloyal and bad faith effort to impose barriers to legal redress for shareholders they have harmed plainly does not relate to  the "managing [of] business" or "the affairs of the corporation" and, thus, falls outside the scope of authority granted by Section 607.0206(2).

49.     The Minimum-Stake-To-Sue Bylaw is also invalid under Section 607.0202 because it is plainly inconsistent with both federal and Florida law.

50.     The Minimum-Stake-To-Sue Bylaw purports to require shareholder consent to initiate derivative suits and shareholder class actions.  But neither consent from absent class members nor a minimum percentage of shareholdings are required elements of a class action under Florida Rule of Civil Procedure 1.220 or Federal Rule of Civil Procedure 23.  And neither shareholder consent nor a minimum percentage of shareholdings are requirements of a derivative claim under Fla. Stat. §607.07401 or Federal Rule of Civil Procedure 23.1.

- 18 -

51.     Indeed, the Minimum-Stake-To-Sue Bylaw effectively interferes with the Board's own fiduciary obligations to consider any written demand to take action by a shareholder, as any non-3% shareholder who makes a demand on Defendants would have no threat of derivative litigation to hold over the Board's head if it does not act because, under the Bylaw, the shareholder would not be legally allowed to sue.

52.     The Minimum-Stake-To-Sue Bylaw is also inconsistent with the federal securities laws, including the Securities Act of 1933 (the "1933 Act") and the Securities Exchange Act of 1934 (the "1934 Act"), which permit holders of even one share to bring claims without shareholder consent. *See*, *e.g.*, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. This is true even if the Minimum-Stake-To-Sue Bylaw is ratified by a shareholder "advisory vote."

53.     The Minimum-Stake-To-Sue Bylaw is also preempted by and irreconcilable with the federal securities laws, the broad purpose of which is deterrence.[9]

54.     The Minimum-Stake-To-Sue Bylaw is inconsistent with these rules and statutes and is against public policy because it imposes an inequitable barrier – written shareholder consent for a

---

[9]     *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC). *See*, *e.g.*, *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005); *J.I. Case Co. v. Borak*, 377 U.S. 426, 432, 84 S. Ct. 1555, 12 L. Ed. 2d 423 (1964). Private securities fraud actions, however, if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81, 126 S. Ct. 1503, 164 L. Ed. 2d 179 (2006). As a check against abusive litigation by private parties, Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA), 109 Stat. 737.").

minimum percentage of shareholdings – designed solely to insulate Defendants from their own misdeeds and prevent injured shareholders from exercising the rights afforded them under the law.

55.    The Minimum-Stake-To-Sue Bylaw imposes requirements and conditions upon shareholders that the United States Supreme Court, the United States Congress, the State Legislature, and regulatory authorities chose not to impose.  The Board has literally taken the law into its own hands.  Class actions are filed and litigated as individual actions until certified by a court.  And the court can dismiss an action if it finds that it does not state a claim.  Indeed, it can impose sanctions upon parties and counsel under Rule 11, 28 U.S.C. §1927, §57.105 of the Florida Statutes, or the PSLRA.  The Minimum-Stake-To-Sue Bylaw requirement that injured shareholders must obtain shareholder consent is also inconsistent with claims under Florida law that do not require pre-filing shareholder approval, such as claims for breach of fiduciary duties and violations of the Florida Business Corporation Act, including Fla. Stat. §607.0304(2)(a), which expressly provides that "[a] corporation's power to act may be challenged . . . [i]n a proceeding by *a shareholder* against the corporation to enjoin the act[.]"  (Emphasis added.)

56.    In any event, as discussed below, in violation of the 1934 Act and the rules promulgated thereunder, Defendants filed a false and misleading Proxy with the SEC, making any "advisory vote" on the Minimum-Stake-To-Sue Bylaw null and void, because Defendants failed to provide shareholders with material information necessary for them to make an informed decision on whether to ratify the Minimum-Stake-To-Sue Bylaw.

57.    Finally, the Minimum-Stake-To-Sue Bylaw is inconsistent with Defendants' fiduciary duties because, on information and belief, it was adopted disloyally and in bad faith, and places

Case No. 15-CV-80505-RYSKAMP

Defendants' interests in avoiding legal liability over shareholders' interests in obtaining redress for harms caused by directors or officers of the Company.

**The Proxy Was False and Materially Misleading in Violation of the 1934 Act**

58.     The Proxy was false and misleading for several material reasons, and did not provide all essential information concerning the Minimum-Stake-To-Sue Bylaw to Imperial Holdings shareholders.

59.     ***First***, the Proxy did not provide ***any*** details to shareholders regarding the pending investigations by the IRS and SEC, the materiality of which is self-evident because Defendants stated in the Proxy that the Company "is currently being investigated by the Internal Revenue Service, which may provide the basis for a lawsuit on behalf of the Company or on behalf of a class of shareholders."  If, as Defendants admit, the IRS investigation "may provide the basis for a lawsuit," the very filing of which would be made virtually impossible by the Minimum-Stake-To-Sue Bylaw, Defendants were obligated to disclose the details surrounding the IRS and SEC investigations, including the stated purpose of each investigation, the individuals involved in each investigation, and status of each investigation, and whether any financial or other penalties are expected as a result of each investigation.  Indeed, to the extent, as Plaintiff believes, the IRS investigation concerns the nefarious scheme the Derivative Defendants permitted the Company to engage in with respect to state court filings in structured settlement factoring transactions, Defendants were required to make full disclosure to Imperial Holdings shareholders prior to any vote on the Minimum-Stake-To-Sue Bylaw.

60.     ***Second***, the Proxy failed to disclose the existence of the case styled *Lafontant v. Wash. Square Fin. LLC, et al.*, Case No. 14-cv-9895 (S.D.N.Y.), where Imperial Holdings is alleged

- 21 -

Case No. 15-CV-80505-RYSKAMP

to have engaged in the same structured settlement transaction scheme identified herein, and could be grounds for future representative litigation against the Company and its directors and officers.

61.     **Third**, the Proxy did not disclose the standards that the Board will use to determine the discovery date of a claim (or date a claim should have been discovered) and that the Board may reject any consents submitted by shareholders for having allegedly selected the wrong date.

62.     **Fourth**, the Proxy did not disclose that the identity of the shareholders (whether record owners or beneficial owners) on the relevant dates is not publicly available and, therefore, the identity of other small shareholders will be unavailable in connection with any effort to obtain the required consents.

63.     **Fifth**, the Proxy disclosed the following misleading view of Defendants: "much shareholder litigation against corporations is not intended to obtain meaningful redress for wrongful acts committed by companies, their officers or directors.  Rather, it is driven by law firms that recruit a shareholder to serve as a representative plaintiff for the purpose of generating legal fees. Typically, these law firms obtain a settlement that includes a company agreeing to pay their fees because that is less costly (for the corporation) than litigating."  Defendants' statement was false and misleading, as it painted a remarkably inaccurate picture of shareholder litigation.  To be sure, since 2000, shareholder litigation in the United States has recovered ***over $77.2 billion*** for shareholders harmed by corporate fraud and other malfeasance – ***including due to certain of the Defendants' own wrongdoing, which resulted in shareholders receiving over $13 million in cash and warrants.***[10] [11]

---

[10]     *See* Renzo Camolli & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2014 Full-Year Review*, NERA ECONOMIC CONSULTING, Jan. 20, 2015, http://www.nera.com/publications/archive/2015/recent-trends-in-securities-class-action-litigation--2014-full-y.html.

- 22 -

Case No. 15-CV-80505-RYSKAMP

64.     *Sixth*, the Minimum-Stake-To-Sue Bylaw itself states, "[e]xcept where a private right of action at a lower threshold than that required by this bylaw is expressly authorized by applicable statute," and the Proxy also stated that the Bylaw does ***not*** "apply to claims…where a private right of action at a lower threshold….is expressly authorized by statute."  These vague and uncertain sentences were not defined in the Proxy and left shareholders wondering as to their meaning.  To be sure, as Plaintiff alleges here, the federal securities laws and the Florida and federal derivative statutes and rules only require the ownership of one share of a Company's stock to have standing to initiate a lawsuit.  In those instances, does the Bylaw apply?  The ambiguity thus compounds the legal problems with the Minimum-Stake-To-Sue Bylaw in the first instance.

65.     *Seventh*, the Proxy misleadingly referred to laws that purport to require certain share percentage holdings, purportedly justifying Defendants' actions here.  This was false and misleading not only because each of the laws cited are inapt, but because the Proxy did not disclose that there are no such requirements to bring federal or Florida derivative claims, or claims under the 1933 Act or the 1934 Act.

66.     *Eighth*, the Proxy failed to disclose the basis for the Board's stated belief that the Minimum-Stake-To-Sue Bylaw will not unduly deter the prosecution of meritorious litigation when, in fact, it most certainly will due to the fact that nearly all shareholder litigation is initiated and prosecuted by shareholders holding less than 3% of a company's outstanding common stock, and the ability to reach out to and obtain consent from other shareholders is exceptionally demanding, if not impossible.

---

[11]    Indeed, upon information and belief, not a single meritorious federal securities class action in the last 5 years, nor any of the top 10 largest securities class action recoveries in history, was prosecuted by a shareholder holding 3% or more of the company's stock.

Case No. 15-CV-80505-RYSKAMP

67.     ***Ninth***, the Proxy failed to disclose the basis for the Board's stated belief that current law (including the business judgment rule, the lead plaintiff provisions of the PSLRA, and the ability of the courts to impose sanctions) is not adequate to deter unmeritorious litigation.

68.     ***Tenth***, the Proxy failed to disclose the Board's understanding – in view of its own self-interest – of what constitutes meritorious or unmeritorious litigation.

69.     ***Eleventh***, the Proxy failed to disclose that of the purported nine shareholders who individually own at least 3% of the Company's outstanding shares, at least four are insiders connected to Bulldog or are executives who have a conflict of interest with respect to the adoption of the Minimum-Stake-To-Sue Bylaw

70.     ***Twelfth***, the Proxy failed to disclose what basis the Board had for choosing a 3% threshold of ownership, as opposed to any other percentage, particularly in view of considerations 4 and 1 on page 34 of the Proxy.

71.     ***Thirteenth***, the Proxy failed to disclose the basis for the representation in consideration 6 on page 34 of the Proxy that the Minimum-Stake-To-Sue Bylaw will reduce the cost of directors and officers insurance and fails to disclose that the cost of insurance can be reduced by directors agreeing to be personally responsible for an underlying amount of any liability.

72.     ***Fourteenth***, the Proxy failed to disclose the fact that individual shareholder pursuit of "meritorious" litigation is disincentivized by the cost and complexity of such litigation, which is only tempered by the ability to pursue class and derivative litigation.

73.     ***Fifteenth***, the Proxy did not advise how the Minimum-Stake-To-Sue Bylaw concerns "managing the business and regulating the affairs of the corporation," pursuant to Fla. Stat.

- 24 -

Case No. 15-CV-80505-RYSKAMP

§607.0206, and is not instead a limitation or regulation of the powers of shareholders, pursuant to Fla. Stat. §607.0202.

74.    **Sixteenth**, although the substantive sections of the Proxy stated that the shareholder vote on the Bylaw was merely an "advisory vote," the "Proxy Voting Instructions" card attached at the end of the Proxy did not.  This was materially misleading not only because it is contradictory, but the Proxy and Proxy Card did not present information in a clear and impartial manner. 17 C.F.R. §240.14a-4(a).

75.    **Seventeenth**, despite knowing at the time of the issuance of the Proxy that they were planning a rights offering, Defendants did not file any supplement or amendment to the Proxy disclosing that the rights offering to issue up to over 5.3 million shares of common stock, disclosed in a Form 8-K filed on May 14, 2015, will make the 3% threshold in Minimum-Stake-To-Sue Bylaw even more difficult to reach because those shares, which Defendant Mitchell has already stated will be purchased by Defendants and Bulldog, will increase exponentially – by at least 25% and as high as 31.25% – the number of shares a shareholder must obtain consent from in order to sue Defendants for corporate malfeasance.

76.    **Eighteenth**, the Proxy failed to disclose that the nation's most respected corporate governance and proxy advisory firms, ISS and Glass Lewis, strongly recommended AGAINST the Minimum-Stake-To-Sue Bylaw.

77.    Without disclosure of the material information above, Plaintiff and the class of Imperial Holdings public shareholders were unable to make intelligent, rational, and informed decisions on the Minimum-Stake-To-Sue Bylaw.

- 25 -

**The Derivative Defendants Recklessly Failed to Exercise Proper Oversight of the
Company's Structured Settlement Business Which Permitted the Company to
Engage in a Nefarious Scheme that Now Leaves the Company
Exposed to Substantial Monetary Damages**

78.     Prior to Imperial Holdings' sale of its structured settlement business in October 2013, Imperial Holdings operated in two reportable business segments: life finance and structured settlements.  During the years ended December 31, 2012, 2011 and 2010, the structured settlements business accounted for 72.8%, 27.0% and 12.4%, respectively, of Imperial Holdings' revenues.

79.     A structured settlement transaction occurs when a person's right to receive future structured settlement payments is sold to another in exchange for short term payments at a discounted rate.

80.     For example, when a person receives a settlement from a personal injury lawsuit that is to be paid over time, the recipient of the settlement may decide at some point, for whatever reason (*e.g.*, medical bills, a new car, etc.), that they need more money in the short term than the periodic payment provides over time.  To meet this need, the structured settlement recipient can sell all or part of their future periodic settlement payments for a present (discounted) lump sum.

81.     In 2001, the Internal Revenue Code was amended through the addition of §5891, creating a regulatory paradigm for the factoring industry by providing for a putative 40% excise tax for structured settlement factoring transactions that do not meet certain mandatory requirements.

82.     In order to avoid this excise tax penalty, §5891 requires that all structured settlement factoring transactions be approved by a "qualified [court] order" entered by a state court, in accordance with a qualified state statute.

1038429_1

Case No. 15-CV-80505-RYSKAMP

83.     The failure to obtain a "qualified order" by a state court in accordance with a qualified state statute will leave the purchaser of the structured settlement liable for the 40% excise tax which must be paid to the IRS.

84.     One of the requirements for a "qualified order" is that it comes from a state court where "the payee of the structured settlement is domiciled."

85.     However, some state courts are more rigorous than others when it comes to approving structured settlement factoring transactions.  These "more rigorous" courts: (a) take a very long time to review and approve a transaction; (b) will not "rubber-stamp" approvals of a structured settlement transaction; and/or (c) will not approve a transaction with discount rates too high (e.g., higher than 15%).

86.     On the other hand, some state courts, like Sumter County, Florida, are favored by structured settlement businesses (like Imperial Holdings until October 2013) because they are viewed as willing to "rubber-stamp" any structured settlement factoring transaction put in front of them.

87.     Unwilling to wait or be challenged by certain state courts on its petitions to approve structured settlement factoring transactions in those jurisdictions, the Company engaged in a short-cut scheme that cheated structured settlement annuitants, courts, and the IRS all at the same time.

88.     As alleged in the *Lafontant* lawsuit, and further confirmed through public records, the scheme which the Derivative Defendants permitted Imperial Holdings' employees to engage in worked like this:

        (a)     An Imperial Holdings employee would orchestrate a "relocation" of the annuitant by, among other things: (i) sending money to the annuitant in the form of stored value

- 27 -

Case No. 15-CV-80505-RYSKAMP

cards; (ii) sending the annuitant a plane ticket so he or she could travel to another state; (iii) meeting the annuitant at the airport; (iv) arranging for the annuitant's hotel; (v) arranging for the annuitant to obtain a lease of property in the other state; (vi) arranging for the annuitant to open a bank account and providing the money to fund that account; and (vii) arranging for the annuitant to get a new state identification other than the state of his/her domicile, and going with the annuitant to the appropriate state office and acting as his or her representative with state officials.

(b)     Imperial Holdings would then prepare and file a knowingly falsified and misleading petition with a "friendly" state court in a state other than the one of the annuitant's domicile, which would then get rubber-stamp approval (sometimes Imperial Holdings would actually obtain a new state identification *after* petitioning for court approval of the transaction, but before the hearing).

89.     The scheme, however, had the distinct result of making the state court's order approving the structured settlement factoring transactions an *un*qualified order under Internal Revenue Code §5891, requiring the payment by Imperial Holdings of a 40% excise tax to the IRS.

90.     A search of court records demonstrates that, between 2009 and 2013 alone, *over 300 petitions* to approve structured settlement transfer transactions were filed in Sumter County, Florida by wholly-owned Imperial Holdings subsidiary Washington Square Financial, and adjudicated by

- 28 -

Case No. 15-CV-80505-RYSKAMP

one single Circuit Court Judge.[12]  Sumter County, Florida sits in the middle of Orlando, Tampa, and

Ocala, and has a total population of just over 100,000.[13]

91.      The allegations in the *Lafontant* action are not unique.  Plaintiff's counsel has located

several additional examples where structured settlement beneficiaries appear to have been domiciled

in states other than Florida, but were the subject of Imperial Holdings' petitions to approve transfer

transactions in Sumter County, Florida, filed shortly after the beneficiary obtained a Florida

identification card:

| Beneficiary | State of Domicile at Time of Petition | County and State of Petition/Order | Florida ID Issued | Date of Order(s) Approving Transfer |
|---|---|---|---|---|
| 1 | AZ | Sumter County, FL | 12/10/12 | 12/27/12 |
| 2 | NC | Sumter County, FL | 03/30/12 | 04/26/12<br>07/24/12 |
| 3 | WA | Sumter County, FL | 02/28/12 | 03/14/12<br>04/26/12<br>06/26/12 |
| 4 | NC | Sumter County, FL | 02/25/13 | 02/26/13 |
| 5 | NY | Sumter County, FL | 01/25/12 | 02/13/13<br>05/12/13 |

92.      In addition, Plaintiff's counsel are aware of yet another individual who: (a) was

domiciled in the state of North Carolina; (b) had been denied transfers of his structured settlement

payments in North Carolina on several occasions; (c) was given cash by Imperial Holdings to travel

to Virginia; (d) was told by Imperial Holdings to use his cousin's address in Virginia to obtain a

---

[12]    A true and correct copy of a printout from LexisNexis CourtLink is attached hereto and incorporated herein by reference as **Exhibit A**.

[13]    Although a qualified court order may be obtained in any state court where the annuitant is domiciled, the fact that Imperial Holdings petitioned one Circuit Court Judge in a tiny town in the middle of Florida to approve structured settlement transactions is telling.

Virginia identification card; and (e) had a petition to approve a structured settlement transfer filed on his behalf and approved in Virginia, even though he was not domiciled there.

93.     Upon information and belief, Imperial Holdings has not paid the IRS any excise taxes on the Company's structured settlement factoring transactions with unqualified orders.

94.     Upon information and belief, Imperial Holdings owes the IRS tens of millions of dollars in unpaid excise taxes resulting from the fraudulently obtained unqualified orders approving structured settlement factoring transactions.

95.     Upon information and belief, this scheme was not the work of one or two rogue Imperial Holdings employees, but rather a concerted effort by numerous employees of Imperial Holdings to cheat the IRS, courts around the country, and annuitants.

96.     Upon information and belief, both Imperial Holdings and DRB Capital ("DRB"), which purchased the structured settlement business from Imperial Holdings, used a computer and database management program called Salesforce to maintain vast amounts of information concerning the Company's structured settlement business.

97.     Upon information and belief, for one customer "lead" placed into Salesforce, there were four hierarchical platforms: research; sales; processing; and funding.  When Imperial Holdings' sales account executives would contact annuitants, often through a "cold call" whereby they would attempt to convince annuitants to sell payment streams to Imperial Holdings, they would enter additional information into the "Notes" section of Salesforce.

98.     Upon information and belief, in the Spring of 2014, after the sale of Imperial Holdings' structured settlement business to DRB, the former Vice President of Legal Affairs for Peachtree Settlement Funding, a predecessor to Imperial Holdings, was retained as a "consultant" to

- 30 -

"clean" the Salesforce reports of the structured settlement transactions that had taken place at Imperial Holdings and wash away any inculpating documents and data.

99.     Upon information and belief, in or around the Spring of 2014, the consultant began giving specific directives to modify or manipulate information in the Salesforce databases regarding former Imperial Holdings structured settlement transactions, now owned by DRB.   These modifications and manipulations included, among other things, changes to the addresses and contact information of the beneficiaries.  These directives from the consultant came frequently, and required employees at Imperial Holdings and employees in the Research and Sales departments of DRB to make the demanded changes in the Salesforce databases.

100.     The scheme alleged herein, which was allowed to take place as a direct result of the failure to monitor and oversee in a reckless manner one of the Company's two major business segments by the Derivative Defendants, has caused and will cause substantial financial and reputational harm to the Company, including the payment of millions of dollars in excise taxes, penalties, fines, legal fees, and other damages, and constitutes clear abuse of control, breach of fiduciary duty, and a waste of corporate assets for which the Derivative Defendants should be held liable.  Indeed, the fact that the Company has less than 40 full-time employees, and its offices occupy only one 7,268 square foot space in Boca Raton, Florida, strongly supports the allegation that the Derivative Defendants knew or recklessly should have known of the wrongdoing taking place at the Company.

## CLASS ACTION ALLEGATIONS

101.     Plaintiff brings this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all public holders of Imperial Holdings common stock (the

Case No. 15-CV-80505-RYSKAMP

"Class").  Excluded from the Class are Defendants and any person, firm, trust, corporation, or other entity related to, or affiliated with, any Defendant.

102.    The Class is so numerous that joinder of all members is impracticable.  According to the Company's SEC filings, there were over 21 million shares of the Company's common stock outstanding as of December 31, 2014.  These shares are held by hundreds, if not thousands, of beneficial holders who are geographically dispersed around the country.

103.    There are questions of law and fact which are common to the Class, which predominate over any individual issues.  The common questions include, *inter alia*, the following:

(a)    whether the Minimum-Stake-To-Sue Bylaw is valid and enforceable;

(b)    whether the Minimum-Stake-To-Sue Bylaw is inconsistent with law and public policy;

(c)    whether Defendants have breached their fiduciary duties of good faith, loyalty, and due care owed to Plaintiff and the other members of the Class;

(d)    whether Plaintiff and the Class are entitled to declaratory relief;

(e)    whether Plaintiff and the Class are entitled to injunctive relief; and

(f)    whether the Proxy was materially false and misleading and violated the 1934 Act and the rules promulgated thereunder.

104.    Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff does not have any interests adverse to the Class.

105.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

Case No. 15-CV-80505-RYSKAMP

106. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

107. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein thereby making appropriate the declaratory and injunctive relief sought herein with respect to the Class as a whole.

108. Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

109. Plaintiff also brings this claim derivatively in the right and for the benefit of Imperial Holdings to redress injuries suffered and to be suffered by Imperial Holdings as a direct result of the breaches of fiduciary duty, abuse of control, and waste of corporate assets by the Derivative Defendants based on their systematic failure to oversee and monitor one of the Company's two business segments. Imperial Holdings is named as a nominal party solely in a derivative capacity.

110. Plaintiff will adequately and fairly represent the interests of Imperial Holdings in enforcing and prosecuting its rights.

111. Plaintiff is an owner of Imperial Holdings stock and was an owner of Imperial Holdings stock during all times relevant to the Defendants' wrongful course of conduct as alleged herein and, thus, has standing to bring this action.

112. Plaintiff will fairly and adequately represent the interests of the Company in enforcing the rights of the Company, as detailed herein.

- 33 -

113.     This action is not being used by Plaintiff to gain any personal advantage, nor does Plaintiff maintain any personal agenda other than seeking to correct the wrongs that have been done to the Company.  To this end, Plaintiff has taken steps to file this action and has retained counsel experienced in derivative litigation and corporate governance actions.

114.     The Derivative Defendants sued herein cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action for the reasons detailed throughout this complaint.  Consequently, Plaintiff's demand upon the Company to take the action requested herein is excused as futile.  A majority of Imperial Holdings' Board and its management are also antagonistic to this lawsuit as follows, and thus, Plaintiff has not made a pre-filing demand on the Imperial Holdings Board to initiate this action:

(a)     The members of the Board approved the Minimum-Stake-To-Sue Bylaw challenged in this litigation, and continue to push for its approval by the shareholders;

(b)     At least five of the seven members of the Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the Company for the violations of law complained of herein.  These are people with whom they have developed professional relationships, who are their friends, and with whom they have entangling alliances, interests, and dependencies.  Therefore, the Board members are not able to, and will not, vigorously prosecute any such action.  Among other things, Goldstein, Dakos and Hellerman are all affiliated with Bulldog Investors, and Goldstein, Dakos, Hellerman, Mitchell, and Crow have been directors of Imperial during and since the time of the wrongdoing alleged with respect to the structured settlement business.

(c)     On information and belief, five of the seven members of the Board who are

the Derivative Defendants recklessly failed to monitor and oversee the structured settlement business

thereby allowing for the scheme alleged herein to occur, have taken no steps to take responsibility

for the Company's failings, including the payment of unpaid excise taxes, fines, and IRS penalties,

and are therefore incapable of exercising independent objective judgment in deciding whether to

bring this action;

(d)     On information and belief, all members of the Board were aware that, in the

Spring of 2014, the former Vice President of Legal Affairs for Peachtree Settlement Funding, a

predecessor to Imperial Holdings, was retained as a "consultant" to "clean" the Salesforce reports of

the structured settlement transactions that had taken place at Imperial Holdings;

(e)     On information and belief, certain members of the Board are likely targets of

the IRS and SEC investigations and are not capable of independently reviewing allegations

pertaining to those very investigations;

(f)     In order to properly prosecute this lawsuit, it would be necessary for a

majority of the directors to sue themselves – something they are unwilling to do.  Such a suit would

require these directors to expose themselves to millions of dollars in liability to the Company and its

shareholders.  Indeed, the entire Board is attempting to block entirely the ability of shareholders to

sue them *vis-à-vis* the Minimum-Stake-To-Sue Bylaw, and thus each director has demonstrated his

antagonism to shareholder litigation in general.

115.    Plaintiff has not made a demand on the shareholders of Imperial Holdings to institute

this action because such demand would be a futile and useless act for the following reasons:

Case No. 15-CV-80505-RYSKAMP

(a)     Imperial Holdings is a publicly traded company with over 21 million shares outstanding, and thousands of shareholders;

(b)     Making demand on such a large number of shareholders would be impossible for Plaintiff who has no way of obtaining the names, addresses, or phone numbers of the shareholders; and

(c)     Making a demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## CAUSES OF ACTION

### COUNT I

### Violations of §14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder
### (Against All Defendants)

116.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 108 above, as if fully set forth herein.

117.     Defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

118.     The Proxy was prepared, reviewed and/or disseminated by Defendants.   It misrepresented and/or omitted material facts, including the material information described in ¶¶59-76, above.

119.     In so doing, Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions within the

- 36 -

Case No. 15-CV-80505-RYSKAMP

Company, Defendants were aware of this information and of their duty to disclose this information in the Proxy.

120.     Defendants were at least reckless in filing the Proxy with these materially false and misleading statements.

121.     The omissions and false and misleading statements in the Proxy were material in that a reasonable shareholder would consider them important in deciding how to vote on the Minimum-Stake-To-Sue Bylaw.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

122.     By reason of the foregoing, Defendants have violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

## COUNT II

### Violation of §20(a) of the 1934 Act
### (Against All Defendants)

123.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 108 above, as if fully set forth herein.

124.     Defendants acted as controlling persons of Imperial Holdings within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Imperial Holdings and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

- 37 -

125.    Each of the Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

126.    In particular, each of the Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contained the unanimous recommendation of each of the Defendants to approve the Minimum-Stake-To-Sue Bylaw.  They were thus directly involved in the making of this document.

127.    In addition, as the Proxy set forth at length, and as described herein, Defendants were each involved in approving the Minimum-Stake-To-Sue Bylaw.  The Proxy purported to describe the various issues and information they reviewed and considered, descriptions which had input from all Defendants.

128.    By virtue of the foregoing, Defendants have violated §20(a) of the 1934 Act.

129.    As set forth above, Defendants had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the 1934 Act.

Case No. 15-CV-80505-RYSKAMP

## COUNT III

### Declaratory Judgment Pursuant to 28 U.S.C. §2201
### (Against All Defendants)

130.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 108 above, as if fully set forth herein.

131.     Plaintiff brings this claim for a declaratory judgment pursuant to 28 U.S.C. §2201 to determine the validity of the Minimum-Stake-To-Sue Bylaw and the rights of Plaintiff and the Class.

132.     Plaintiff alleges that the Minimum-Stake-To-Sue Bylaw is invalid because it is an *ultra vires* attempt to regulate an extraneous matter that does not relate to the business or affairs of the Company, is inconsistent with Florida and federal law, and was adopted in breach of Defendants' fiduciary duties and in violation of Fla. Stat. §607.0206.

133.     Pursuant to 28 U.S.C. §2201, Plaintiff respectfully requests that the Court enter a Declaratory Judgment in Plaintiff's favor, declaring that Defendants' Minimum-Stake-To-Sue Bylaw is invalid and unenforceable and adopted in breach of Defendants' fiduciary duties, and also grant Plaintiff the costs of this action and such other relief as this Court deems just and proper.

## COUNT IV

### Breach of Fiduciary Duties
### (Against All Defendants)

134.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 108 above, as if fully set forth herein.

135.     Defendants, in bad faith, have knowingly, willfully, and recklessly violated fiduciary duties of good faith, loyalty, and due care owed to Plaintiff and the public shareholders of Imperial

Holdings and have put their own interests ahead of the interests of both the Company and those public shareholders.

136.    By the acts and courses of conduct alleged herein, Defendants, individually and acting as part of a common plan, knowingly, willfully, or recklessly, and in bad faith, are attempting to unfairly deprive Plaintiff and the other members of the Class of their right to effectively deter, stop, and seek redress for legal harms caused by Defendants and officers of the Company.

137.    As alleged herein, the Defendants knowingly, willfully, and recklessly breached their duties of good faith, loyalty, and due care owed to the shareholders of Imperial Holdings because, among other reasons, they failed to act in the best interests of the public shareholders of Imperial Holdings common stock, as well as the Company itself, and placed their own interests over the interests of the Company's shareholders and failed to fully inform themselves of the circumstances and legality surrounding the Minimum-Stake-To-Sue Bylaw.

138.    As a result of the Defendants' unlawful actions, Plaintiff and the other members of the Class will be irreparably harmed in that they will be unable to effectively deter, stop, and seek redress for legal harms caused by directors and officers of the Company.

139.    Plaintiff and the other members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the irreparable injury that Defendants' actions are causing.

140.    Unless this Court enjoins Defendants from enforcing the Minimum-Stake-To-Sue Bylaw, the Defendants will continue to knowingly, willfully, or recklessly, and in bad faith, breach their fiduciary duties owed to Plaintiff and the Class, and keep them from effectively deterring, stopping, and seeking redress for legal harms caused by Imperial Holdings' directors and officers.

Case No. 15-CV-80505-RYSKAMP

## COUNT V

### Claim for Injunctive Relief Pursuant to Florida Statutes §607.0304
### (Against All Defendants)

141.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 108 above.

142.    Fla. Stat. §607.0304(2)(a) grants shareholders the right to bring an action against their corporation to enjoin an *ultra vires* act.

143.    As alleged herein, Imperial Holdings has adopted a Minimum-Stake-To-Sue Bylaw that falls outside the scope of authority granted by Fla. Stat. §607.0206, as it does not relate to the business or affairs of the Company, is inconsistent with Florida and federal law, and was adopted in breach of the Board's fiduciary duties.

144.    Therefore, Imperial Holdings lacked power to adopt the invalid and unlawful Minimum-Stake-To-Sue Bylaw, and its adoption of the Bylaw was an *ultra vires* act enjoinable under Fla. Stat. §607.0304(2)(a).

145.    Pursuant to Fla. Stat. §607.0304(2)(a), Plaintiff and the other members of the Class respectfully request that this Court enjoin Imperial Holdings from enforcing the Minimum-Stake-To-Sue Bylaw that was adopted through an *ultra vires* act of the Company.

## COUNT VI

### Claim for Preliminary and Permanent Injunctive Relief
### (Against All Defendants)

146.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 108 above, as if fully set forth herein.

- 41 -

Case No. 15-CV-80505-RYSKAMP

147.    As alleged herein, the Individual Defendants knowingly, willfully, and recklessly breached their duties of good faith, loyalty, and due care owed to the shareholders of Imperial Holdings because, among other reasons, they failed to act in the best interests of the shareholders and placed their own interests over the interests of the Company's shareholders and failed to fully inform themselves of the circumstances and legality surrounding the Minimum-Stake-To-Sue Bylaw.

148.    Plaintiff and the Class have a substantial likelihood of success on the merits of their claims as the Minimum-Stake-To-Sue Bylaw was adopted in breach of the Individual Defendants' fiduciary duties and is clearly inconsistent with Florida and federal law.

149.    Plaintiff and the other members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the irreparable injury that Individual Defendants' actions are causing.

150.    Unless this Court enjoins Defendants from enforcing the Minimum-Stake-To-Sue Bylaw, the Individual Defendants will continue to knowingly, willfully, or recklessly, and in bad faith, breach their fiduciary duties owed to Plaintiff and the Class, and keep them from effectively deterring, stopping, and seeking redress for legal harms caused by Defendants and other members of Company management.

151.    Plaintiff respectfully requests a preliminary and permanent injunction barring Defendants from enforcing the Minimum-Stake-To-Sue Bylaw against Plaintiff and the other members of the Class.

Case No. 15-CV-80505-RYSKAMP

152.    Plaintiff also seeks a preliminary and permanent injunction barring Defendants from enforcing the Bylaw and from holding a shareholder vote on the Bylaw without full disclosure of all material information, as alleged in ¶¶59-76, above.

## COUNT VII

**Breach of Fiduciary Duty**
**(Derivatively on Behalf of the Company Against the Derivative Defendants**
**Goldstein, Dakos, Mitchell, Crow, and Hellerman)**

153.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 100 and 109 through 115 above, as if fully set forth herein.

154.    As alleged in detail herein, Defendants, by reason of their positions as officers and directors of Imperial Holdings, owed Imperial Holdings fiduciary obligations of loyalty, good faith, independence, and candor in the management and administration of the affairs of the Company and were and are required to use their utmost ability to manage Imperial Holdings in a fair, just, honest, and equitable manner.

155.    The Derivative Defendants violated their fiduciary duties of loyalty, good faith, independence and candor by failing in their enumerated duties which has caused the Company substantial harm, financial and reputational, and will likely result in substantial fines, penalties, legal fees, and other damages to the Company.

156.    The Derivative Defendants' conduct was done with knowledge or, at a minimum, recklessness.  Prior to its sale, the structured settlement division of Imperial Holdings was one of only two main segments of the entire business.  As members of the Board, the Derivative Defendants had an obligation to ensure compliance with all legal obligations of the Company involving each business segment, including the important obligation of paying any 40% excise taxes to the IRS for

- 43 -

petitions involving non-qualified court orders.  A large-scale scheme within one of two business segments involving the filing of hundreds if not thousands of transfer petitions, including over 300 before one Florida state court judge in one Florida county more than 200 miles northwest of Imperial Holdings' headquarters, at a Company with less than 100 full-time employees, would have put any reasonable director on notice that something was amiss.  The failure of the Derivative Defendants to uphold their proper oversight role for the Company constitutes, at a minimum, recklessness and not mere negligence.

157.    But for the abdication of the Derivative Defendants' fiduciary duties, the Company would not have been damaged.  Accordingly, all of the Derivative Defendants breached their fiduciary duties.

158.    As a direct and proximate result of the Derivative Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT VIII

### Abuse of Control
### (Derivatively on Behalf of the Company Against the Derivative Defendants Goldstein, Dakos, Mitchell, Crow, and Hellerman)

159.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 100 and 109 through 115 above, as if fully set forth herein.

160.    The Derivative Defendants' misconduct alleged herein constitutes a breach of their fiduciary duties because they abused their ability to control and influence Imperial Holdings, for which they are legally responsible.

161.    The Derivative Defendants' abuse of control was done with knowledge or, at a minimum, recklessness.  Prior to its sale, the structured settlement division of Imperial Holdings was

Case No. 15-CV-80505-RYSKAMP

one of only two main segments of the entire business. As members of the Board, Defendants had an obligation to ensure compliance with all legal obligations of the Company involving each business segment, including the important obligation of paying any 40% excise taxes to the IRS for petitions involving non-qualified court orders. A large-scale scheme within one of two business segments involving the filing of hundreds if not thousands of transfer petitions, including over 300 before one Florida state court judge in one Florida county more than 200 miles northwest of Imperial Holdings' headquarters, at a Company with less than 100 full-time employees, would have put any reasonable director on notice that something was amiss. The failure of the Derivative Defendants to uphold their proper oversight role for the Company constitutes, at a minimum, recklessness and not mere negligence.

162.    As a direct and proximate result of the Derivative Defendants' abuse of control, Imperial Holdings has sustained significant damages.

163.    As a result of the misconduct alleged herein, the Derivative Defendants are liable to the Company.

## COUNT IX

**Gross Mismanagement**
**(Derivatively on Behalf of the Company Against the Derivative Defendants**
**Goldstein, Dakos, Mitchell, Crow, and Hellerman)**

164.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 100 and 109 through 115 above, as if fully set forth herein.

165.    By their actions alleged herein, the Derivative Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

Case No. 15-CV-80505-RYSKAMP

to prudently managing the assets and business of Imperial Holdings consistent with the operations of a publicly held corporation.

166.    The Derivative Defendants' gross mismanagement was done with knowledge or, at a minimum, recklessness.  Prior to its sale, the structured settlement division of Imperial Holdings was one of only two main segments of the entire business.  As members of the Board, Defendants had an obligation to ensure compliance with all legal obligations of the Company involving each business segment, including the important obligation of paying any 40% excise taxes to the IRS for petitions involving non-qualified court orders.  A large-scale scheme within one of two business segments involving the filing of hundreds if not thousands of transfer petitions, including over 300 before one Florida state court judge in one Florida county more than 200 miles northwest of Imperial Holdings' headquarters, at a Company with less than 100 full-time employees, would have put any reasonable director on notice that something was amiss.  The failure of the Derivative Defendants to uphold their proper oversight role for the Company constitutes, at a minimum, recklessness and not mere negligence.

167.    As a direct and proximate result of the Derivative Defendants' gross mismanagement and breaches of duty alleged herein, Imperial Holdings has sustained significant damages.

168.    As a result of the misconduct and breaches of duty alleged herein, the Derivative Defendants are liable to the Company.

Case No. 15-CV-80505-RYSKAMP

## COUNT X

**Waste of Corporate Assets**
**(Derivatively on Behalf of the Company Against the Derivative Defendants**
**Goldstein, Dakos, Mitchell, Crow, and Hellerman)**

169.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 100 and 109 through 115 above, as if fully set forth herein.

170.    As a result of the improper conduct described herein, and by failing to properly consider the interests of the Company and its public shareholders and by refusing to conduct proper supervision, the Derivative Defendants have caused and will continue to cause Imperial Holdings to waste valuable corporate assets and incur substantial expenses to defend their unlawful actions.

171.    The Derivative Defendants' waste of corporate assets was done with knowledge or, at a minimum, recklessness.  Prior to its sale, the structured settlement division of Imperial Holdings was one of only two main segments of the entire business.  As members of the Board, Defendants had an obligation to ensure compliance with all legal obligations of the Company involving each business segment, including the important obligation of paying any 40% excise taxes to the IRS for petitions involving non-qualified court orders.  A large-scale scheme within one of two business segments involving the filing of hundreds if not thousands of transfer petitions, including over 300 before one Florida state court judge in one Florida county more than 200 miles northwest of Imperial Holdings' headquarters, at a Company with less than 100 full-time employees, would have put any reasonable director on notice that something was amiss.  The failure of the Derivative Defendants to uphold their proper oversight role for the Company constitutes, at a minimum, recklessness and not mere negligence.

1038429_1

Case No. 15-CV-80505-RYSKAMP

172.     As a result of the waste of corporate assets, the Derivative Defendants are liable to the

Company.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in his favor and against Defendants as follows:

A.     Declaring that this action is properly maintainable as a class action;

B.     Appointing Plaintiff as Class representative and Plaintiff's counsel as Class Counsel;

C.     Declaring that the Minimum-Stake-To-Sue Bylaw is invalid and unenforceable;

D.     Declaring that the Board breached its fiduciary duties;

E.     Preliminarily and permanently enjoining Defendants from enforcing the Minimum-Stake-To-Sue Bylaw;

F.     Awarding damages to Plaintiff and the Class in an amount to be determined at trial;

G.     Awarding damages to the Company in an amount to be determined at trial;

H.     Awarding Plaintiff the costs of this action, including reasonable attorneys' and experts' fees; and

I.     Granting any and all other further relief as this Court may deem just and proper.

Case No. 15-CV-80505-RYSKAMP

DATED:  June 9, 2015

ROBBINS GELLER RUDMAN
    & DOWD LLP
PAUL J. GELLER
Florida Bar No. 984795
STUART A. DAVIDSON
Florida Bar No. 084824
ROBERT J. ROBBINS
Florida Bar No. 572233
CHRISTOPHER C. MARTINS
Florida Bar No. 088733


*s/ Stuart A. Davidson*
STUART A. DAVIDSON

120 East Palmetto Park Rd., Suite 500
Boca Raton, FL  33432
Telephone: 561/750-3000
Fax: 561/750-3364
pgeller@rgrdlaw.com
sdavidson@rgrdlaw.com
rrobbins@rgrdlaw.com
cmartins@rgrdlaw.com

WEISSLAW LLP
JOSEPH H. WEISS
JOSHUA M. RUBIN
DAVID C. KATZ
1500 Broadway, 16th Floor
New York, NY  10036
Telephone: 212/682-3025
212/682-3010 (fax)
jweiss@weisslawllp.com
jrubin@weisslawllp.com
dkatz@weisslawllp.com

Attorneys for Plaintiff and the Class

1038429_1

Case No. 15-CV-80505-RYSKAMP

## VERIFICATION

I hereby verify that I have reviewed the Verified Amended Shareholder Class Action and Derivative Complaint filed directly and on behalf, and for the benefit, of Imperial Holdings, Inc. ("Imperial Holdings" or the "Company") and authorized its filing and that the foregoing is true and correct to the best of my knowledge, information, and belief, and based on the investigation of counsel.  I am a current holder, and have been a holder of Imperial Holdings common stock at the times the wrongful conduct alleged and complained of in the complaint was occurring.

Dated: _____6/2/15_____

_____

Harry Rothenberg

Case No. 15-CV-80505-RYSKAMP

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 9, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 9, 2015.

*s/ Stuart A. Davidson*
STUART A. DAVIDSON

ROBBINS GELLER RUDMAN
   & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

E-mail:sdavidson@rgrdlaw.com

1038429_1